379 A.2d 72

COMMONWEALTH of Pennsylvania

v.

Ronald JOHNSON, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 22, 1974.

Reassigned Aug. 15, 1977.

Decided Oct. 7, 1977.

Rehearing Denied Nov. 10, 1977.

514

Joseph N. Bongiovanni, Jr., Philadelphia, for appellant.

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., Mark Sendrow, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

ROBERTS, Justice.

Appellant Ronald Johnson was indicted on charges of murder, rape and conspiracy arising out of the May 9, 1970 killing of Sharon Pruitt. The case was originally brought to trial on March 22, 1972, but ended in a mistrial. The court appointed new counsel, who filed a pre-trial application to suppress. The application was granted as to certain evidence seized by the police, but denied as to a typewritten statement taken from appellant by the police. The case proceeded to trial on January 3, 1973, and the jury found appellant guilty of rape, conspiracy, and murder of the second degree. Post-verdict motions were denied, and appellant was sentenced to concurrent sentences of eight to eighteen years on the murder and rape convictions. Sentence was suspended on the conspiracy conviction. In this appeal [1] appellant contends that the statement taken from him was obtained through the exploitation of an unlawful search and should have been suppressed as the fruit of that illegality. We agree,[2] reverse judgments of sentence and grant appellant a new trial.

### I.

On Sunday, May 10, 1970, the body of the victim, who had been sexually abused, was discovered in the rear yard of a vacant house next door to appellant's house in Philadelphia. The body was next to a fence separating the two houses, and

1. This court has jurisdiction over the appeal from the murder conviction pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp. 1977). The rape and conspiracy convictions were appealed to the Superior Court which certified the appeal to this Court.

2. Because we reverse on this ground, we need not address appellant's other claims, that: 1) his statement should have been suppressed as involuntary; and 2) the trial court erred in denying his request for a jury instruction on voluntary manslaughter.

the police concluded the body had been thrown over the fence from appellant's yard.[3]  The police entered appellant's house, without first obtaining a search warrant, and found evidence of the crime, including bloodied sheets and female clothing.  The police then questioned appellant's neighbors and determined that appellant was the occupant of the house.

Appellant was taken into custody near his house at 5:30 p. m., May 10, 1970.  Before taking appellant to the Police Administration Building, the police told him they wanted to question him about the crime, but appellant made no response.  Appellant was so intoxicated he was staggering, and apparently had to be helped to the police car.

When he arrived at the Police Administration Building at 6:15 p. m., appellant was placed in an interrogation room and given *Miranda* warnings.[4]  The police then told appellant about the evidence of the crime which had been found in his house.[5]  Appellant responded: "I want to tell you

**3.** There were abrasions on the body which could have been caused by scraping against the fence.  In addition, the presence of dust on the window sill of the house next door suggested the body had not been dropped from that window.

**4.** See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** At the suppression hearing Detective William Thompson testified:
"Q. [by defense attorney]: By the way, when you were questioning the defendant did you tell him that you had found evidence in his house?
A. Yes, sir.
Q. When did you first tell him that?
A. First told him when we first brought him in.
Q. You mean on the 10th?
A. Yes, sir."
  Detective Thompson set the time when he first told appellant that evidence had been found in his house at 6:15 p. m., May 10:
"Q. [by defense attorney]: Now, also, if I understand you correctly—and if this statement I make is not correct, you correct me—it was at 9:45 on May the 11th that you first told that appellant about the evidence you had found in his house, is that correct or not?
A. No, sir.
Q. You had told him for the first time the day before then?
A. Yes, sir.
Q. And that would have been on May the 10th, around 6:12 p. m.?
A. 6:15, sir."

what I know. I gave a key to somebody last night. I'm not taking the rap for anybody." Appellant said he gave the key to William Holden. At 6:30 p. m. appellant was left alone in the interrogation room to try to sober up."

At 7:30 p. m., appellant was given a sandwich and coffee. He was left alone in the interrogation room from 8:55 p. m. until 10:15 p. m. At 10:15 p. m. appellant's wife arrived at the police station. Appellant's wife and a police detective discussed the crime with appellant from 10:15 p. m. until 11:15 p. m., but obtained no additional information.[6] From 11:15 p. m. until 11:50 p. m., appellant and his wife were left alone in the interrogation room. After his wife left, appellant was left alone for 40 minutes, until 12:30 a. m., Monday, May 11, when he was given food and coffee. At 1:10 a. m., appellant was allowed to sleep in a metal chair in the interrogation room.

Appellant was awakened at 9:10 a. m., Monday, May 11, and given a meal. By this time appellant appeared sober. Another interrogation began at 9:45 a. m. Appellant again was told about the evidence found in his house,[7] and also was

---

**6.** It appears that appellant was again informed that evidence was found in his house during this session. Detective Anthony Malfi testified at the suppression hearing:

"Q. [by defense counsel]: What about the second interview, the one at which his wife was present? At that time did you tell him about the evidence that was found?

A. I believe I told the wife prior to her going into the room with him.

Q. And then did you tell him, though?

A. I may have, sir, but I don't recall if I did or not.

Q. Do you recall whether his wife told him?

A. I believe she did say something to him on that order, yes, sir."

Appellant's wife implored appellant to tell what he knew about the crime. Appellant repeated his story that he had given a key to his house to William Holden, but gave no additional information.

**7.** Detective Thompson testified:

"Q. [by defense counsel]: . . . And then, if I understand you, you told him the second time about the evidence in his house at 9:45, is that correct,—

A. Yes, sir.

Q. —on May the 11th?

A. Yes, sir.

told of information obtained from William Holden, whom the police had taken into custody after appellant identified him the night before. Appellant then made an incriminating statement.[8] The interrogation ended at 10:15 a. m., and appellant was left alone until 10:45 a. m.

At 10:45 a. m., a police officer administered to appellant a polygraph examination, which lasted until 12:50 p. m. Appellant then was fed and left alone until 2:40 p. m.

Appellant was then "confronted" with William Holden, who had previously given an inculpatory statement to the police which implicated appellant. Appellant, Holden, and police detectives were together for approximately 10 minutes, after which the detectives left appellant and Holden together for another 30 minutes. Appellant was left alone from 3:30 until 3:45 p. m. Appellant then made another inculpatory statement, which was typed by the police and signed by appellant at 6:05 p. m., May 11. This was the typewritten statement admitted at trial. During the entire

Q. That's 9:45 a. m.?
A. Yes, sir.

. . . . .

Q. As I understand it, at 9:45 on May the 11th the defendant did tell you some things, like he was upstairs.
Now, my question to you is that, if I understand you correctly, before the defendant told you that, you told him again on May the 11th about some of the evidence you had found in his house, is that correct?
A. Yes, sir."

8. Detective Thompson's handwritten notes of this statement were not available at the suppression hearing because they had been misplaced, and Detective Thompson's recollection of the statement was unclear. At one point, he testified that the statement taken during this interrogation session was "substantially similar" to the typewritten statement taken later that afternoon which was admitted into evidence at trial. He testified that appellant admitted being in the house at the time of the crime, going upstairs and helping undress the victim, and telling others who participated in the crime to get rid of the body. At another point in his testimony, however, Detective Thompson stated that appellant did not admit that he helped undress the victim until the typewritten statement was taken that afternoon. Rather, Detective Thompson stated that in the morning interrogation session appellant admitted only that he was at his house at the time of the crime, and that he had gone upstairs where the victim was being held.

period after the morning interrogation session began at 9:45 a. m. until the statement was signed at 6:06 p. m., except for when appellant was taken to the restroom and to the polygraph room, appellant was handcuffed to a metal chair attached to the floor of the interrogation room.

## II.

The suppression court ruled that the evidence seized from appellant's house was inadmissible because it was taken during an unlawful warrantless search. The court concluded, however, that the illegality of the search did not require suppression of the typewritten statement later taken from appellant. We agree with the suppression court that the search of appellant's house violated his right to be free from unreasonable searches and seizures. U.S.Const. amends. IV, XIV, Pa.Const. art. I, § 8. We further conclude that the statement taken from appellant was the product of that illegality and therefore cannot agree with the suppression court that the statement was admissible at trial.

■ A. The Commonwealth argues that the search of appellant's house was lawful. We cannot agree. Assuming that the Commonwealth had probable cause to search appellant's home, the search would still be unlawful unless there were exigent circumstances justifying the search without first obtaining a warrant. *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29, cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). There were no exigent circumstances here. The condition of the body made it clear that the body had been disposed of several hours earlier, making it unreasonable to assume the criminal was still in the area trying to make an escape or to destroy evidence. Indeed, when the police entered appellant's house they did not believe anyone was home. See *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Commonwealth v. Linde*, 448 Pa. 230, 293 A.2d 62, cert. dismissed, 409 U.S. 1031, 93 S.Ct. 523, 34 L.Ed.2d 482 (1972); *Commonwealth v. Ellsworth*, 421 Pa. 169, 218 A.2d 249 (1966).

■■■ B. Evidence obtained in violation of an individual's constitutional right to be free from unreasonable searches and seizures cannot be used against him at trial. *Commonwealth v. Platou*, 455 Pa. 258, 312 A.2d 29, cert. denied, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). Because the search of appellant's house was in violation of his constitutional rights, the typewritten statement taken from him is inadmissible unless the Commonwealth can establish it is sufficiently purged of any taint of the unlawful activity. See *Commonwealth v. Farley*, 468 Pa. 487, 364 A.2d 299 (1976); *Commonwealth v. Whitaker*, 461 Pa. 407, 336 A.2d 603 (1975); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972) (Opinion of Eagen, J., joined by O'Brien and Pomeroy, JJ.). The test for the admissibility of such evidence is

" 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

*Wong Sun v. United States*, 371 U.S. 471, 483, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Maguire, Evidence of Guilt 221 (1959). Accord, *Commonwealth v. Banks*, 429 Pa. 53, 239 A.2d 416 (1968).

■■ In this case, the typewritten statement used against appellant at trial was obtained as a direct result of the unlawful search. The police obtained the statement as a result of three factors: (1) appellant's arrest and the extended custodial interrogation which followed; (2) confrontation of appellant with the fact that evidence had been obtained during the unlawful search of his house; and (3) confrontation of appellant with information obtained from William Holden. Each of these three factors, in turn, is directly attributable to the unlawful search.

1.

Appellant's arrest was a direct result of the unlawful search. Before searching appellant's house, the police did

not suspect that appellant had committed the crime. Only after searching appellant's house, and finding incriminating evidence, did the police seek to ascertain appellant's identity. Police detectives searched the house on the afternoon of May 10, 1970. The detectives then ascertained appellant's identity from neighbors, and left to find him. They found appellant at an address around the corner from appellant's house, and arrested him at 5:30 p. m., May 10. Appellant was in custody continuously from the time of this arrest until the typewritten statement was taken from him during the interrogation session which began at 3:45 p. m. the following afternoon. Thus, it cannot be said that appellant's statement "resulted from 'an intervening act of a free will.' " *Wong Sun v. United States,* 371 U.S. at 486, 83 S.Ct. at 416. The statement must be attributed to the arrest of appellant, which in turn must be attributed to the unlawful search of appellant's house. Therefore, appellant's statement must be suppressed.

The suppression court reasoned that the statement taken from appellant was admissible because the police could have ascertained appellant's identity from appellant's neighbors even if the police had not searched appellant's house. However, it was not simply appellant's identity, but his arrest, which produced the incriminating statements. Without the evidence discovered in appellant's house, the police did not have probable cause to arrest appellant. If the police knew appellant's identity, but had not been aware of the evidence found in his house, they could have asked him questions, but could not have taken him into custody.

Taking appellant into custody was an essential step towards obtaining his statements. When the police detectives first encountered appellant on May 11, and told him they wanted to question him about the crime, they obtained no response from appellant. Only after appellant was placed in an interrogation room at the Police Administration Building did he make any statement. His first incriminating statement was not taken until he had been in custody for sixteen hours. The typewritten statement was taken from appel-

lant over twenty-two hours after the arrest. Clearly, knowledge of appellant's identity alone was not enough to produce the incriminating statements.

## 2.

■ An even more direct relationship between the unlawful search and the statement taken from appellant is revealed by the use during the interrogation sessions of the evidence obtained during the unlawful search. Statements made by the accused because he is confronted with illegally seized evidence are inadmissible. *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963) (dictum); *United States ex rel. Hardy v. Brierley*, 326 F.Supp. 364 (E.D.Pa. 1971), aff'd, 458 F.2d 38 (3d Cir. 1972) (dictum); cf. *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964) (statement obtained from witness who was confronted with evidence seized in violation of defendant's rights not admissible); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972) (Opinion of Eagen, J., joined by O'Brien and Pomeroy, JJ.) (same). In this case, there can be little doubt that the statement obtained from appellant at 6:15 p. m., May 10, and the incriminating statement obtained at 9:45 a. m., May 11, were obtained because appellant was told about the evidence found in his house. These statements were obtained immediately after the police informed appellant about this evidence.[9] Similarly, the typewritten statement, taken during the afternoon session on May 11, must be attributed to illegally seized evidence. Appellant still knew of the illegally seized evidence, as he had been apprised that morning of the evidence the police found in his home. See *Amador-Gonzales v. United States*, 391 F.2d 308 (5th Cir. 1968) (statement taken from defendant, who knew of illegal-

---

**9.** Indeed, Detective Thompson concluded that the first statement, taken from appellant at 6:15 p. m., May 10, was produced by informing appellant of the evidence the police had found:

"Q. [by the Assistant District Attorney]: How did that statement come up?

A. Because we told him—I told him that we were questioning him about the young girl that was found in the yard and we had found evidence that it was—it happened in his house."

ly seized evidence because he had been present when it was seized a few hours earlier, inadmissible at trial). Moreover, being told of the evidence had already induced appellant to make an incriminating statement. See generally *Commonwealth v. Banks*, 429 Pa. 53, 239 A.2d 416 (1968).

### 3.

Finally, the incriminating statements made by appellant were taken after he was confronted with information taken from William Holden. This information also must be attributed to the unlawful search.

■ The police learned of Holden's identity and his presence in appellant's house on the night of the crime as a result of the statement taken from appellant at 6:15 p. m., May 10. The police then took Holden into custody and obtained a statement from Holden incriminating appellant. Appellant was confronted with this information before he made an incriminating statement at 9:45 a. m., May 11, as well as before the typewritten statement taken that afternoon. Since the police learned of Holden's involvement through the statement appellant gave at 6:15 p. m., May 10—a statement which unquestionably was a direct result of the unlawful search—the statement subsequently obtained from appellant, as a result of information taken from Holden, must also be suppressed. Cf. *United States v. Tane*, 329 F.2d 848 (2d Cir. 1964) (witness' identity learned as a result of unlawful search); *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972) (Opinion of Eagen, J., joined by O'Brien and Pomeroy, JJ.) (same).

This case is controlled by *Commonwealth v. Whitaker*, 461 Pa. 407, 336 A.2d 603 (1975). Whitaker was arrested, without probable cause, on November 22, 1972. Whitaker gave a statement implicating John Barton in the crime, and was released. Two days later, Barton was arrested, and Barton gave a confession, implicating Whitaker in the crime. Acting on this information, the police again arrested Whitaker, who confessed after being confronted with the information taken from Barton. This Court required the suppression of

Whitaker's confession. Mr. Justice Pomeroy, writing for the Court, stated:

"In the present case the progression is . . . complex, but the fact that there are several links and a five-day time span in this chain of events is not significant; what is of critical importance for constitutional purposes is that there exists a real and direct causal connection between appellant's unlawful arrest on November 22 and his ultimate confession on November 27."

Id. 461 Pa. at 413, 336 A.2d at 606.[10]  So too, the typewritten statement taken from appellant should have been suppressed.  It was taken after appellant was confronted with information taken from Holden, whose identity was learned from a statement taken from appellant which in turn was a product of the unlawful search.  Indeed, this presents a more compelling case than *Whitaker* for the suppression of the statement taken from appellant, for the chain of events took place over a much shorter period.

### III.

Appellant's statement was the product of multiple pressures, all of which lead directly back to the primary illegality of the warrantless search.  The prohibition against unreasonable searches and seizures in both the United States and Pennsylvania Constitutions requires that appellant's statement be suppressed as the fruit of an unlawful search.

Judgments of sentence reversed and a new trial granted.

JONES, former C. J., did not participate in the decision of this case.

**10.**  See *Commonwealth v. Cephas*, 447 Pa. 500, 511–12, 291 A.2d 106, 111–12 (1972)  (Opinion of Eagen, J., joined by O'Brien and Pomeroy, JJ.):

"If deterrence of improper police conduct is to be effective, the exclusionary rule must be strict.  To permit the prosecution to use a witness obtained as a direct result of an illegal search would frustrate the objectives of the Fourth Amendment just as much as would use of a tangible article found during the same search, thus, the Fourth Amendment would be turned into a mere 'form of words.'"

O'BRIEN, J., concurs in the result because appellant's request for a jury instruction on voluntary manslaughter was denied, but agrees with NIX, J., that the search of appellant's home was valid.

NIX, J., filed a dissenting opinion.

EAGEN, C. J., dissents.

NIX, Justice, dissenting.

The majority agrees with the suppression court that the search of appellant's house was in violation of his Fourth and Fourteenth Amendment right prohibiting unreasonable searches and seizures. They further find the statement taken from appellant was a fruit of that illegality and should have been suppressed. I do not agree with either conclusion, and hence this dissent.

A review of the facts of this case indicates there was probable cause to search appellant's home. The majority points out the police had concluded that the body was thrown over the fence from appellant's yard into the back yard of the adjoining premises. This position is supported by the fact that the police noticed a nail protruding from the rough fence, consistent with the abrasions and puncture marks on the body. Their conclusion was further bolstered by the fact that there was dust on the window sills of the house adjacent to appellant's property, suggesting the body had not been dropped from those windows. Detective Melfi, who searched the house, testified he went to the front of appellant's house and from the public sidewalk was able to see the front room which was in a state of disarray. Under these facts I am satisfied that the information possessed by the police was sufficient to support the conclusion that the deceased had been killed in the house of appellant and thereafter thrown over the fence into the yard of the adjoining residence. Since evidence required to establish probable cause for search need not amount to that required to convict, *Commonwealth v. Dussell*, 439 Pa. 392, 266 A.2d 659 (1970), it is clear from the evidence that the police had probable cause to search the house.

Having decided that there was probable cause, the presence of exigent circumstances must be found to justify a warrantless search. *United States v. Davis*, 461 F.2d 1026 (3rd Cir. 1972); *Commonwealth v. Shaffer*, 447 Pa. 91, 288 A.2d 727 (1972). Cases describing exigent circumstances have included the situation in which, based on surrounding circumstances and information at hand, it is reasonable to conclude the evidence will be destroyed or removed before they can secure a search warrant. *United States v. Canada*, 527 F.2d 1374, 1379 (9th Cir. 1975); *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973). Here, the nature of the crime was such that the police could reasonably expect to find readily destructible or removable evidence. Upon viewing the bloody nude body of the victim, the police would naturally be looking for clothes and blood spattered objects, the type of evidence to which "exigent circumstances" is in part directed.

The majority, in negating the existence of exigent circumstances, relies on the fact that the body was disposed of hours before the police arrived. I do not find this fact to be critical. This period of time is not so long as to necessitate the conclusion that there was an abandonment of intent to destroy the evidence. At the time of the search, it was reasonable to assume destruction or removal of the evidence was still imminent. Under the circumstances, the police acted properly in entering the house and seizing the evidence in plain view. Finding the search and seizure free from illegality, the subsequent confrontation of appellant with the evidence did not render his confession invalid.

Even if probable cause and exigent circumstances were not found to exist, I agree with the trial court in finding the confession was not a fruit of the poisonous tree. The appellant's confession was elicited after being confronted with his co-defendant, William Holden. The connection between the search of appellant's house and the confrontation with William Holden is so slight as to be "purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 483, 83 S.Ct. 407, 417 (1963).