**COMMONWEALTH of Pennsylvania**

v.

**Dale ROOD, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 1996.
Decided Dec. 9, 1996.

Michael C. Morrone, Williamsport, for appellant.

Robert W. Ferrell, III, Williamsport, for appellee.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and KELLEY, JJ.

DOYLE, Judge.

This is an appeal by Dale A. Rood from an order of the Court of Common Pleas of Lycoming County which found Rood guilty of violating three sections of the Game and Wildlife Code [1] (Code) and imposed fines totaling $1,100.00.

---

1. The sections under which Rood was convicted are as follows: Section 2711(a)(1) of the Code, 34 Pa.C.S. § 2711(a)(1), hunting without a license; Section 2307(a) of the Code, 34 Pa.C.S. § 2307(a), abiding, abetting, attempting or conspiring to hunt, take, or possess or use game (a deer); and Section 2321(a)(1) of the Code, 34 Pa.C.S. § 2321(a)(1), attempting to take a second deer.

The facts of this case may be summarized as follows. At approximately 12:25 p.m. on December 14, 1992, a dispatcher from the Pennsylvania Game Commission (Commission) received an anonymous tip that two untagged deer, which had been killed illegally by "a hunter," were in a barn on the property where Rood lived and that the hunter was still hunting at that location. Wildlife Conservation Officer Robert Barber was informed of the tip, and he and Michael A. Lander, a Deputy Wildlife Conservation Officer, proceeded to Rood's property to investigate the reportedly illegal deer and to locate the unknown hunter. The officers arrived at the Rood residence, dressed in full uniform, at approximately 1:00 p.m. that afternoon.

The officers pulled into the driveway and went directly to the house to obtain information regarding the anonymous call. They knocked on both the front door and the back door; no one answered. Still searching for someone with information about the reported deer and unknown hunter, the officers went to the home of one of Rood's neighbors. After knocking on the neighbor's door, a woman answered. The officers asked her about the location of the Rood home, and she indicated to them that the Rood residence was the place from which they just came. The officers then returned to the Rood house and knocked on the door again, but this time more loudly; still, no one answered. The officers continued looking around the property in order to locate someone who would know something about the reported untagged deer and the unknown hunter who was still at large. Thinking that perhaps someone may be working in the garage or barn area, the officers proceeded to the back of the house. This required the officers to climb over a corral fence. They observed the area outside of the garage and barn, but still found no one. From approximately fifteen feet outside of the barn, however, the officers could see two hanging deer carcasses through the open barn door.[2] Although the officers did not obtain a search warrant at any point during this episode, the officers

were not, at that time, engaged in a search for evidence against Mr. Rood.

After their unavailing attempt to locate someone with whom they could speak, the officers returned to Officer Lander's vehicle, which was parked near the barn. Shortly thereafter, the officers observed a man walking toward the Rood residence from the woods carrying a rifle and dressed in hunting clothes. The officers, who were still in full uniform, approached the man and identified themselves as game officers. They explained to the man that they were investigating a report of two untagged deer and an illegal hunter. The man indicated that he was John Morgan, Rood's stepson. After verifying that he had a valid hunting license, the officers read Miranda warnings to Morgan and questioned him directly about the deer they observed through the open barn door. Morgan responded that Rood admitted to him earlier that he had shot one of the deer and that "Andy Kieser"[3] had shot the other. Morgan also told them that Rood and Kieser were still out hunting in the field.

Thereafter, Officer Lander continued the investigation that had been prompted by the anonymous caller and, pursuant to his authority under Section 741 of the Code, 34 Pa.C.S. § 741, to "go upon any land outside of buildings" in performing his duties, proceeded through a field in an effort to locate the individual who was reportedly still out hunting. Shortly thereafter, Officer Lander observed Rood and Kieser on the edge of a wooded area. Rood was dressed in hunting gear, positioned in a tree stand with three rifles, and *was without a valid hunting license.* Officer Lander also noticed that both men were looking toward the woods intently and were holding firearms; specifically, Rood was holding a loaded 30–06 rifle. Officer Lander immediately approached the men, identified himself, and stated the reason for his presence.

At the request of Officer Lander, all three men returned to the Rood residence. Officer Barber and another officer, Officer Scott Laird, read Rood his *Miranda* warnings, and

---

2. The barn door, which was ajar, faced an enclosed corral in which horses were kept.

3. Andy Kieser is not a party to the instant action before this Court.

proceeded to interview him while Officer Lander interviewed the other man. On request of the officer, Rood returned to an area near the barn and voluntarily signed a statement indicating that he "got" a deer at approximately 9:30 a.m. that morning. Rood also signed a consent form agreeing to allow the deer to be removed from his barn.

During the hearing before the court of common pleas, Rood requested that the court suppress all of the evidence seized by the officers. This evidence included, *inter alia,* statements made by Rood, the consent form signed by Rood, the statements made by Morgan, the rifles and ammunition that were found with Rood, and the two deer carcasses. Rood asserted that this evidence was the fruit of an unconstitutional entry onto Rood's property and a subsequent unconstitutional search pursuant to the Fourth Amendment to the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution.[4]

The court of common pleas found that the search of the barn was an unconstitutional search and that Morgan's statement "to the extent that it establishes any testimonial significance against Mr. Rood may not be properly admitted." (1/23/95 Notes of Testimony (N.T.) at 8; Reproduced Record (R.R.) at 246a.) However, the trial court did not suppress any of the other evidence, holding that the evidence which was gathered subsequent to the lawful encounter with Rood in the field was admissible——specifically, that the statements made by Rood himself and his consent to release the deer to the officers were independent of the illegal search of the barn.

Based upon Rood's statements, the officer's observation of Rood clad in hunting gear and holding a gun, and Rood's failure to possess an appropriate hunting license, the court found Rood guilty of violating three sections of the Code.

■ Rood appeals to this Court,[5] alleging that *all* of the evidence should have been suppressed because it was the product of an illegal search and thus inadmissible against him.

■ Rood's first contention is that the entry of the officers onto his property without a warrant and the subsequent search violated the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution.[6] The Commonwealth asserts that the officers were not searching the property, but rather looking for a person with whom to speak about the alleged illegal hunting activity. The Commonwealth claims that the officers inadvertently observed the inside of the barn as they were looking for someone with information who may have been in the barn or at least nearby. Therefore, the Commonwealth argues, the inadvertent discovery of the deer through an open door was lawful and admissible based upon the "plain view doctrine."[7]

■ A search under the Fourth Amendment occurs where there is a government intrusion upon an individual's legitimate expectation of privacy, an expectation which must be actual and one that society recognizes as being reasonable. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d

4. The Fourth Amendment provides for the right of individuals to be secure in their persons, houses, papers and effects. The rights protected under the Fourth Amendment are essentially the same as those secured by Article 1, Section 8 of the Pennsylvania Constitution. *Commonwealth v. Heidelberg,* 369 Pa. Superior Ct. 398, 535 A.2d 611 (1987), *aff'd per curiam sub nom. Commonwealth v. Gilliam,* 522 Pa. 138, 560 A.2d 140 (1989).

5. Our scope of review is limited to determining whether the trial court committed an error of law or whether the findings of the trial court are supported by competent evidence. *Blobner v. Commonwealth,* 144 Pa.Cmwlth. 100, 600 A.2d 708 (1991).

6. Section 901(2) of the Code, 34 Pa.C.S. § 901(2), permits Wildlife Officers to "[g]o upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty." The Fourth Amendment, however, applies to all duly qualified law enforcement officers, including Wildlife Officers. *Commonwealth v. Palm,* 315 Pa. Superior Ct. 377, 462 A.2d 243 (1983).

7. Generally, evidence is in "plain view" of a police officer where it is readily observable by the public; such an observation is not considered to be a "search" under the Fourth Amendment. *Commonwealth v. Lemanski,* 365 Pa. Superior Ct. 332, 529 A.2d 1085 (1987).

576 (1967). The Fourth Amendment does not proscribe warrantless searches, but rather unreasonable searches. *United States v. Samuels*, 374 F.Supp. 684 (E.D.Pa.1974). The reasonableness of a specific search is contingent upon the circumstances of the particular case, and the burden is on the Commonwealth to prove that the search did not violate the Constitution. *Id.*

 It is well established that a reasonable expectation of privacy generally does not exist in activities that are exposed to or observable from a vantage point accessible to the public. *Lemanski.* The protection afforded by the Fourth Amendment, however, extends to the curtilage of one's home: "The curtilage area surrounding a private house is entitled to protection ... as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept." *Lemanski*, 365 Pa. Superior Ct. at 349, 529 A.2d at 1093. Curtilage is defined as the land or structures immediately adjacent to a dwelling or within close proximity thereto, an area which is typically enclosed in some manner by a fence, shrubs, or the like. *United States v. Romano*, 388 F.Supp. 101 (E.D.Pa. 1975).

In the instant case, we agree with the trial court's determination that the search of the barn area amounted to an unconstitutional search because the barn was located within the curtilage of the home. The barn on Rood's property is located within close proximity to the house, and, for the officers to see through the open barn doors, they had to climb over a fence and traverse the curtilage of Rood's home. Thus, we hold that the actions of the officers were sufficiently intrusive so as to constitute an infringement of a reasonable expectation of privacy held by Rood.

 As to the officers' contention that the deer were in "plain view," we must disagree. The plain view doctrine applies in two types of situations: (1) where the "view" occurs before an unconstitutional intrusion has occurred; and (2) where the "view" occurs after an intrusion but where such intru-

sion is justified by consent, hot pursuit, a warrant, or otherwise, provided that the "view" was truly inadvertent. *Commonwealth v. Weik*, 360 Pa. Superior Ct. 560, 521 A.2d 44 (1987). Furthermore, the plain view doctrine generally applies only when the authorities are lawfully in the location from which the view is made. Here, the trial court made a factual determination that the officers did not inadvertently see the deer in the barn and that they went beyond a mere search for the property owner when they peered into the barn. They had climbed over the corral fence *before* they saw the deer through the barn door. Because the officers observed the deer from an unlawful vantage point, we agree with the trial court that the plain view doctrine does not justify the admission of the deer carcasses.

 Evidence, both tangible and intangible, must be excluded when such evidence is obtained during, or as a direct result of, an unlawful intrusion. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest is considered the "fruit of the poisonous tree" and is inadmissible evidence. *Id.* Accordingly, a defendant may request that the testimony or statements made by a witness be suppressed when such statements are procured as a result of the illegal intrusion. *Commonwealth v. Cephas*, 447 Pa. 500, 291 A.2d 106 (1972). Other evidence which has been obtained following an illegal intrusion must be suppressed unless the evidence is sufficiently purged of any taint which derives from the illegality. *Id.* The Commonwealth must prove that the taint does not infect the evidence obtained and that it was procured by lawful and sufficiently distinguishable means. *Id.*

 Here, Morgan's statement was made within a few minutes after the officers observed the deer carcasses hanging in the barn. Upon meeting Morgan, Officer Lander asked him directly if he knew anything about the deer in the barn.[8] However, statements obtained from a witness who is con-

---

8. Officer Lander stated that he asked Morgan "to supply a statement as to any knowledge he had

concerning the deer in the barn[.]" (12/5/94 N.T. at 64; R.R. at 68a.)

fronted with illegally seized evidence are not admissible. *Commonwealth v. Johnson,* 474 Pa. 512, 379 A.2d 72 (1977). Thus, Morgan's statements concerning the circumstances of the deer were also properly suppressed.

Rood further argues that his own statements, the consent form which he signed, the deer carcasses then obtained with his consent, the rifles and ammunition, as well as the other evidence seized from him in the tree stand, should all have been suppressed. He argues that the initial illegal search led to the inadmissible statements of Morgan which, in turn, led Officer Lander to his place in the tree stand. We disagree.

The United States Supreme Court, in *Wong Sun,* held that not all evidence

> is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'

371 U.S. at 488, 83 S.Ct. at 417 (quoting Maguire, Evidence of Guilt, 221 (1959)). In this regard, to the extent that this case requires us to analyze the connection between the illegal search of the barn and evidence seized thereafter, the instant matter implicates the inevitable discovery doctrine as well as the independent source rule.[9]

 Pursuant to the **inevitable discovery doctrine,**

> if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means, ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received.

*Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). Likewise,

pursuant to the **independent source rule,** evidence is admissible when it "was in fact discovered lawfully, and not as a direct or indirect result of illegal activity." *Herrold,* 962 F.2d at 1140. Both the inevitable discovery doctrine and independent source rule are intended to "put[ ] the police in **the same, not a worse,** position [than] they would have been in if no police error or misconduct had occurred." *Id.* at 443, 104 S.Ct. at 2508 (emphasis added). Suppressing evidence which is supported by an independent source, or which would have inevitably been discovered, would effectively place the police and prosecutors in a worse position when the particular evidence was, or would have inevitably been, **lawfully** obtained. In such situations, there is no significant causal connection between the acquisition of the evidence and the unlawful police conduct, and evidence so obtained is not considered to be tainted by, or to be the fruit of, an illegal search. *See id.*

 Similarly, a defendant's own free will in confessing may purge evidence of any taint deriving from an illegal search. To determine if a particular admission is tainted by unlawful police conduct, the court must examine the totality of the circumstances. *Commonwealth v. Whitaker,* 461 Pa. 407, 336 A.2d 603 (1975). The factors to be examined are as follows: (1) the voluntariness of the confession, *i.e.,* whether the defendant's statement was an act of free will sufficient to purge the primary taint, *Commonwealth v. Shaw,* 494 Pa. 364, 431 A.2d 897 (1981); (2) "the intervention of other circumstances subsequent to an illegal arrest which provide a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by that illegal arrest[,]"; (3) the temporal proximity of the arrest and the confession, *Commonwealth v. Farley,* 468 Pa. 487, 364 A.2d 299 (1976); and (4) the purpose and flagrancy of the official misconduct, *Brown.*

---

**9.** Although these two principles are closely related and often mistakenly used interchangeably, they are, in fact distinct from one another. The United States Court of Appeals for the Third Circuit expressed this distinction as follows: "The independent source and inevitable discovery doctrines ... differ in that the former focuses on what actually happened and the latter considers what would have happened in the absence of the initial search." *United States v. Herrold,* 962 F.2d 1131, 1140 (3d Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992).

■ In the instant case, we hold that Rood's statements and consent form, the after-acquired deer carcasses, rifles, ammunition, and other evidence seized from him, were all properly admitted. Rood's statements and consent, the subsequent removal of the deer, as well as the other evidence seized, were not causally related to the illegal search of Rood's barn, and, thus, the evidence was not "come at by exploitation of that illegality," but by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (internal quotation marks omitted).

First, we believe that the inevitable discovery doctrine applies to this case and, thus, that the exclusionary rule does not preclude the admission of evidence resulting from the discovery of Rood's location. The trial court found that, regardless of the initial discovery of the deer in the barn and Morgan's statement, Officer Lander would have walked through the open field in search of illegal hunters and inevitably would have come upon Rood. This conclusion is abundantly supported by the record.

Debra Switcher, the Game Commission employee who received the anonymous call, testified as follows:

> I received a call from a female[ ] who ... stated that in fact there was two deer in the stall and she described the location as being Dale Rood's residence. [The deer] were untagged, *and the hunter was still out hunting* ....

(12/5/94 N.T. at 5; R.R. at 10a.) (Emphasis added.) Additionally, Officer Barber testified that the investigation was prompted by the "reported violation of two un-cut deer in a stall in a barn and *the hunter was still out hunting.*" (12/5/94 N.T. at 11; R.R. at 16a.) (Emphasis added.) Officer Lander testified that on December 14, 1992, the date of the incident, he was responding to a radio report that someone located on Dale Rood's property at the time was illegally "taking deer." (12/5/94 N.T. at 60; R.R. at 64a.) It is highly unlikely that the officers would have simply left Rood's property without even bothering to search for the illegal hunter (*i.e.,* a hunter without a valid license), especially consider-

ing that the officers were already provided with information regarding the hunter's general whereabouts by virtue of the anonymous call. Rather, searching for the individual reportedly hunting illegally on Rood's property was one of the principal reasons for their trip to the location, and, thus, they undoubtedly would have found Rood in the open field absent the search of his barn and the statements of Morgan.

Even if Morgan's statements provided the officers with some assistance that may have expedited the search for Rood, this fact does not undermine the conclusion that the officers would, in any event, have discovered Rood hunting on his own property. The record supports the trial judge's conclusion that the officer's would have inevitably found Rood in the very area described by the anonymous caller. The trial judge appropriately found that the Commonwealth met its burden by establishing, by a preponderance of the evidence, that the officers would have discovered Rood:

> the officers are there ... to look for a hunter who is still out in the woods, ... and given the Game Commission's authority under the [C]onstitution and the statute to go about into the open fields to make a determination about the hunting, I don't find that Mr. Lander's venture out into the fields where he confronted Mr. Rood is dependent upon the fact that they found deer in the barn, and it's not dependent upon the fact that they got a statement from Mr. Morgan.... *I believe that the clear indication from all the evidence is that Mr. Lander would have gone searching out in the fields for Mr. Rood in any event and that his finding Mr. Rood in the fields is not a direct result or fruit of finding the deer in the barn.*

(1/23/95 N.T. at 9–10; R.R. at 247a–248a.) (Emphasis added.) As discussed above, we find that this conclusion is well supported by the record.

■ Additionally, we find it significant that Rood was discovered in what would be considered an "open field" for Fourth

Amendment purposes.[10] Pursuant to the open fields doctrine, "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." *Oliver*, 466 U.S. at 178, 104 S.Ct. at 1741. Consequently, except for open areas within the curtilage of one's home, any "expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.' " *Id.* at 179, 104 S.Ct. at 1741. Thus, because Rood had no reasonable expectation of privacy in the outdoor wooded area in which he was found, his discovery cannot be said to constitute an ongoing invasion of his privacy which resulted from the illegal search of his barn.[11] This consideration further attenuates the causal connection between the discovery of Rood and the prior unlawful search of his property.

Furthermore, Officer Lander was specifically authorized and, in fact, required by law to investigate the field and wooded area located on Rood's property. Specifically, Section 741 of the Code, 34 Pa.C.S. § 741, provides as follows:

> Any officer whose duty it is to enforce this title or any officer investigating any alleged violation of this title shall have the *power and duty* to:
>
> . . . .
>
> (2) Go upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty. (Emphasis added.)

Thus, Officer Lander's discovery of Rood in the woods was accomplished during the course of performing his duties under Pennsylvania law, and he was statutorily authorized to venture out into the field and wooded areas located on Rood's property in search of the man reportedly hunting illegally thereon.

Thus, because the officers would have inevitably discovered Rood in the open field in which he was hunting, an area where the officers are permitted by law to investigate potential game violations, we find that such action on the part of the officers is sufficiently attenuated from the illegal search of the barn so as not to be tainted thereby and that the evidence was not "come at by exploitation of" the illegal search. *See Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417.

Once Officer Lander came upon Rood, he observed that Rood was hunting, a conclusion established by the fact that Rood was wearing hunting gear, had weapons with him, and was in a tree stand. The officer further found that Rood did not have a valid hunting license, which led to Rood's immediate arrest and lawful questioning subsequent to being given *Miranda* warnings. For the reasons described above, we find that the trial court did not err in admitting this evidence.

■ Second, we hold that the statement Rood provided to the officers was the product of his own free will, an independent lawful source, and was thus not tainted by the prior illegal search. Rood was not in any way coerced into providing the statement to the officers and, contrary to the position of the appellant, the record does not support the conclusion that he provided the statement because he was confronted with evi-

---

10. Of course, "[i]t is clear ... that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage" and that "[a]n open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver v. United States*, 466 U.S. 170, 180 n. 11, 104 S.Ct. 1735, 1742 n. 11, 80 L.Ed.2d 214 (1984). As the United States Supreme Court stated, "a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Id.* Thus, although Rood was discovered on the border of an open field and wooded area, for the purposes of Fourth Amendment analysis, he was found in an "open field."

 In *Commonwealth v. Cihylik*, 337 Pa. Superior Ct. 221, 232, 486 A.2d 987, 993 (1985), the Superior Court of Pennsylvania stated that "[t]he term 'open fields' has been defined as 'privately owned grounds or buildings which are not located in close proximity to the owner's dwelling.' " (quoting *Commonwealth v. Robbins*, 216 Pa. Superior Ct. 233, 235, 263 A.2d 761, 762 (1970) (Hoffman, J., concurring)). The area in which Rood was found certainly fits within this definition, and this fact has not been disputed by either party.

11. We recognize, however, that, under certain circumstances, an illegal search may be so egregious as to taint the discovery of evidence, even where the discovery of such evidence may be legally supported by independent grounds. We do not, however, believe that such circumstances existed in the present case.

dence discovered during the illegal search of his barn. Rather, it is much more likely that his willingness to cooperate and provide the statement to the officers stemmed from the fact that he was caught red-handed; he was found in the woods during doe season, up a tree, without a valid license, in possession of a number of rifles, including a loaded 30–06, and wearing hunting gear. Rood's exculpatory testimony at his trial, that he had been in the tree stand watching for an injured deer at the request of a neighbor, was obviously ludicrous and was rejected by the trial court. (12/5/94 N.T. at 10; R.R. at 248a.)

Thereafter, Rood voluntarily admitted in writing that he had hunted a deer at about 9:30 a.m. on the morning of December 14, 1992, and the remaining portion of Rood's statement, which consisted of responses to a series of questions, were recorded by Officer Barber *after* Rood had been advised of his *Miranda* rights.[12] We, therefore, hold that Rood's voluntary incriminating statements were not the product of the illegal search.

■■■ Third, Rood knowingly consented to a search of the barn and removal of the deer. The search of the barn which ultimately produced the evidence used against Rood was incidental to his consent and not the consequence of the illegal intrusion occurring earlier that day. Thus, the causal nexus between the original illegal search of the barn and the final search of the barn and removal of the deer is substantially attenuated by the independent voluntary actions on the part of Rood.

Accordingly, based upon the admissible evidence, we find that sufficient competent evidence exists to support the order of the Court of Common Pleas of Lycoming County.

Affirmed.

---

12. To the question of "What gun did you shoot your deer with," Rood responded, "30–06 bolt action." Officer Barber also asked Rood if he had a valid hunting license, and Rood responded in the negative. (12/5/94 N.T. at 26; R.R. at 31a.)

1. Under the inevitable discovery doctrine, the prosecution must establish by a preponderance

### ORDER

NOW, December 9, 1996, the order of the Court of Common Pleas of Lycoming County in the above-captioned matter is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. I do not believe that the Commonwealth proved by a preponderance of the evidence that the officers would have conducted a search and, inevitably, would have found Dale Rood hunting in his tree stand without a valid hunting license.[1] Thus, I would reverse the order of the trial court.

The trial court stated that, although Officer Michael Lander went to look for Rood at a particular place based on information obtained during the tainted interrogation of John Robert Morgan,

> I believe that the clear indication from all the evidence is that [the officer] *would have gone searching* out in the fields for Mr. Rood in any event and that his finding of Mr. Rood in the fields is not a direct result or fruit of finding the deer in the barn.

(R.R. at 248a.) (Emphasis added.) Thus, the trial court suggests that the officers inevitably would have discovered the evidence against Rood by lawful means. I cannot agree.

The majority believes that the following facts are sufficient to support the trial court's determination: (1) the anonymous tip indicated that the hunter was still out hunting; and (2) the officers had the power and duty to go upon any land outside of buildings, posted or otherwise, to investigate any alleged violation. (Majority op. at 449–450.) I do not believe that these facts, by themselves, establish by a preponderance of the evidence that the officers would have ultimately conducted a lawful search and would

---

of the evidence that the information ultimately or inevitably would have been discovered by lawful means. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

A preponderance of evidence is evidence which, taken as a whole, shows that the fact sought to be proved is more probable than not. Black's Law Dictionary 1064 (5th ed.1979).

have inevitably discovered Rood hunting at his tree stand without a valid hunting license.

First, *none of the officers testified that they were planning to search Rood's thirty-five acres of land for a hunter whom neither officer would have recognized.*[2] (R.R. at 156a.) Quite the contrary, Officer Barber testified that their sole purpose was to try to locate someone at Rood's *residence* to question about the anonymous tip. (R.R. at 24a, 41a.) There is no evidence that they intended to walk aimlessly over unfamiliar territory to find some unknown person who may have been hunting illegally. Indeed, after the officers found no one at the house or the barn, they returned to their vehicle either to wait or to leave. (R.R. at 27a, 51a.) Having found no one at home to give consent for a lawful search of the barn, I believe it is more likely than not that, until they saw Morgan, the officers were planning to leave the property.[3]

Moreover, even if the officers would have gone searching for Rood at that point, I cannot say that, if the officers had *not* run into Morgan, they would have discovered Rood hunting without a valid hunting license. I believe it would have been nothing more than a scavenger hunt. Without Morgan's or anyone else's statements to guide them directly to Rood's location, the officers would have had no idea where to search on thirty-five acres of unfamiliar land for a hunter whom they never met. Under these circumstances, I believe it is probable that the officers never would have found Rood or Rood's tree stand. Indeed, at any time during the search, Rood could have moved from his tree stand or returned to his house. Thus, the officers might have found Rood, but without any evidence that he was hunting, or they might have found the tree stand, but without Rood.

In sum, unlike the trial court and the majority, I cannot say that the officers *would have gone searching* for Rood simply because they had the power and a duty to go upon land to investigate an alleged violation of the Code, and I certainly cannot say that a search, if made, would have yielded results.[4]

Finally, because I do not believe that the officers would have found Rood without the information which they illegally obtained from Morgan, Rood's subsequent statement and his consent to search the barn do not constitute an untainted and independent source of the evidence against Rood.

Accordingly, I would reverse.[5]

KELLEY, J., joins in this dissent.

2. The officers did not know Rood and had never been on Rood's property; thus, neither officer knew the size or character of Rood's land. Indeed, upon their arrival, they even had to confirm the location of Rood's residence with a neighbor. (R.R. at 23a, 39a, 40a, 67a.)

3. Under section 901(9) of the Game and Wildlife Code (Code), 34 Pa.C.S. § 901(9), the officers had a *duty* to: "Secure ... search warrants ... to search or enter any building, dwelling, house, ..., [or] enclosure." Given their failure to get consent to search the barn and their legal duty to secure a search warrant in such instances, they could not conduct a *lawful* search without a search warrant. Thus, the officers probably would have left the premises.

4. These officers did not get consent to search the barn and, without consent, they had to obtain a search warrant, which they did not do. Thus, their search of the barn was unlawful, and, as indicated above, no lawful search would have occurred thereafter to remove the taint.

5. I also question whether any search of Rood's property by the officers would have been legal without a search warrant. Under 34 Pa.C.S. § 901(9), the officers had a duty to secure a search warrant before entering any *enclosure.*

Here, the record indicates that Rood had enclosed his pasture with a barbed wire fence, an indication that Rood had an expectation of privacy with respect to that pasture. (R.R. at 152a–53a.) Moreover, society recognizes that such an expectation of privacy is reasonable. Indeed, in Pennsylvania, a person who enters a place where the fencing is manifestly designed to exclude intruders is guilty of a misdemeanor of the third degree. *18 Pa.C.S. § 3503(b)(1).*