COMMONWEALTH of Pennsylvania, Appellant,

v.

Speer RUEY, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 4, 2003.

Filed July 8, 2004.

Jeffrey D. Burkett, Asst. Dist. Atty., Brookville, for Com., appellant.

Ralph L.S. Montana, Clarion, for appellee.

BEFORE: DEL SOLE, P.J.,
JOHNSON, HUDOCK, FORD ELLIOTT,
JOYCE, STEVENS, MUSMANNO,
TODD and KLEIN, JJ.

OPINION BY JOHNSON, J.:

¶ 1 The Commonwealth appeals the trial court's order suppressing medical evidence tending to indicate that Speer Ruey was legally intoxicated when he was involved in a four-car accident that caused injuries to several people and the death of one Clarence Main. The Commonwealth's appeal requires us to examine the contours of Pennsylvania's "independent source doctrine," which the trial court rejected as a basis for admitting the evidence in question. The Commonwealth concedes that the original warrant application which led to the seizure of the blood-alcohol content (BAC) test results in question was technically deficient, but contends that the trial court erred in granting Ruey's suppression motion because that same evidence was later recovered by means of a proper warrant. The Commonwealth's interlocutory appeal lies within this Court's jurisdiction pursuant to Pa.R.A.P. 311(d), because it has certified that the order in question "will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d); *see* *Commonwealth v. Karetny,* 837 A.2d 474 (Pa.Super.2003). We agree with the Commonwealth that the trial court should have applied the independent source doctrine under the circumstances of this case, thus we reverse the trial court's suppression order and remand.

¶ 2 On March 26, 1999, Ruey was involved in a four-vehicle collision, resulting in injuries to several people and the death of Clarence Main. Ruey eventually was charged with driving while under the influence of alcohol (DUI), homicide by motor vehicle while DUI, aggravated assault by vehicle while DUI, homicide by vehicle, involuntary manslaughter, aggravated assault, simple assault, and recklessly endangering another person. On May 2, 2000, Ruey filed a pre-trial motion seeking to suppress all evidence seized by the police as a result of State Trooper Mark Bryan's search warrant, which provided for the production of all medical records pertaining to the University of Pittsburgh Medical Center's (UPMC) treatment of Ruey on or after the date of the accident, and was executed on April 3, 1999. He contended that the search warrant application was not supported by probable cause since Trooper Bryan did not indicate that the information he received from others was reliable or that he believed the information to be credible. Omnibus Pretrial Motion for Relief, 5/2/00, at 3–4. Ruey further alleged that the application for the search warrant was overly broad and that the search warrant was executed in an untime-

ly manner. Omnibus Pretrial Motion for Relief, 5/2/00, at 4–6.

¶ 3 On November 24, 2000, before the suppression court ruled on Ruey's motion to suppress, Pennsylvania State Trooper Keith Allen applied for a second search warrant seeking Ruey's medical records from UPMC, where Ruey was treated following the accident. In his Affidavit of Probable Cause, Trooper Allen alleged that Emergency Medical Services (EMS) personnel made statements to him indicating that Ruey smelled of alcohol, wept, asked about his dog, and used vulgar language. Warrant Application, 11/24/00, at 2. Trooper Allen indicated that Trooper Bryan told him that he had found an empty bottle of chardonnay near Ruey's vehicle, and a partially empty bottle of vodka and a partially empty bottle of wine inside Ruey's vehicle. Warrant Application, 11/24/00, at 2. Trooper Allen averred that Ruey was flown to UPMC for treatment of his injuries and that he had probable cause to believe that the UPMC medical records would indicate evidence of criminal activity. Warrant Application, 11/24/00, at 2–3. In response to Trooper Allen's application, a district justice issued a second search warrant.

¶ 4 In its November 29, 2000 order the trial court noted the Commonwealth's concession that the first search warrant was invalid and that the Commonwealth intended to introduce alternative theories to support its position against suppression. On January 22, 2001, the Commonwealth filed a brief in opposition to Ruey's motion to suppress arguing that the suppression court should not suppress the evidence because the second search warrant had been sworn properly since execution of the first, defective warrant. The Commonwealth's argument relied principally on the independent source doctrine. Brief in Op-

position to Defendant's Omnibus Pretrial Motion, 1/22/01, at 3–6.

¶ 5 A suppression hearing was held on September 24, 2001. At the hearing, Trooper Bryan testified that he responded to the accident, and upon arrival "set up traffic control, went and observed the different vehicles that were involved, and tried to gather" information. Notes of Testimony (N.T.), 9/24/01, at 10. Trooper Bryan interviewed EMS personnel, including Donald Moore and Kenneth Allshouse. N.T., 9/24/01, at 14–15. Moore told Trooper Bryan that Ruey was drunk, crying, and asking after his dog. N.T., 9/24/01, at 14. Trooper Bryan searched Ruey's vehicle and observed an empty bottle of chardonnay, a partially empty bottle of vodka, and a partially empty bottle of wine. N.T., 9/24/01, at 15. Trooper Bryan asked the hospital to draw Ruey's blood to determine whether he was legally intoxicated, but the hospital was "[u]ncooperative" and "said they were busy and they would do that anyhow." N.T., 9/24/01, at 17. Trooper Bryan then secured the first search warrant to obtain Ruey's hospital records. N.T., 9/24/01, at 17.

¶ 6 Trooper Bryan noted that Trooper Allen was present at the accident scene and that "[p]rimarily, he assisted at the scene, and eventually he helped with the reconstruction to take measurements." N.T., 9/24/01, at 19. Trooper Bryan spoke to Trooper Allen several times about the investigation and Trooper Allen "conferred with [Trooper Bryan] for information he needed for the new search warrant, and just other preliminary stuff . . . ." N.T., 9/24/01, at 20. Trooper Bryan provided Trooper Allen with a full and complete copy of his original investigatory file. N.T., 9/24/01, at 21.

¶ 7 Trooper Allen testified at the suppression hearing that he initially went to the accident scene to deliver supplies, but

that he spoke with another on-scene officer to determine what had happened. N.T., 9/24/01, at 22. Trooper Allen did not conduct interviews at this time, but only assisted with accident reconstruction. N.T., 9/24/01, at 23. Later, a prosecutor asked him to prepare a new search warrant. In preparing a new warrant application, Trooper Allen

> spoke with Trooper Bryan; glanced through the report and went over the investigation ...; [he] drafted up a preliminary copy of the affidavit and the search warrant, which was reviewed by [the prosecutor. Allen] reviewed it for spelling corrections and other additional requirements that needed to be fixed in the warrant.

N.T., 9/24/01, at 24. Trooper Allen re-interviewed Mr. Moore, Mr. Allshouse, and Paul Verne, whom Allen identified from Trooper Bryan's report. N.T., 9/24/01, at 24–25, 31. Trooper Allen testified that "[e]verything [he] learned after talking to the people was the same" as what Trooper Bryan had learned, that he "looked at what [Trooper Bryan] did and looked to make sure it was correct," and that he "talked to people again." N.T., 9/24/01, at 33. The Affidavit of Probable Cause prepared by Trooper Allen contained "the re-interviews ... plus what [the witnesses] said at the preliminary investigation." N.T., 9/24/01, at 32–33.

¶ 8 Following the hearing, by order entered November 14, 2001, the suppression court granted Ruey's motion to suppress the medical records obtained by the police from UPMC. In its order, the suppression court made numerous findings of fact, examined the independent source doctrine, and concluded that the Commonwealth may not remedy an illegal search by the reenactment of an investigation by a different officer. Trial Court Opinion (T.C.O.), 11/14/01, at 5–6 (unnumbered).

The Commonwealth timely appealed, and the matter originally came before a three-judge panel of this Court. On February 11, 2003, the panel filed a Memorandum affirming the suppression court's ruling. *See Commonwealth v. Ruey,* 178 WDA 2002 (Pa.Super.2003) (unpublished memorandum). The Commonwealth filed an application for reargument *en banc,* which we granted.

¶ 9 Thus, the Commonwealth continues to seek reversal of the trial court's suppression order, presenting the following questions for our review:

I.   Whether, after a law enforcement officer had amassed abundant probable cause to obtain medical records (including blood alcohol content readings) and obtained a search warrant based upon an application that was technically invalid, the Commonwealth should forever be precluded from obtaining a second search warrant to obtain those medical records when no information from the results of the first search is used in the affidavit and probable cause to believe that a search will reveal evidence of criminal conduct continues to exist.

II.  Whether the Supreme Court's ruling in *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996) regarding the "independent investigative team" requirement should be overruled.

*En Banc* Brief for Commonwealth at 4. The Commonwealth explicitly acknowledges that its second question is included "merely for the purpose of issue preservation. The Commonwealth is cognizant of the fact that the Superior Court does not have the authority to overrule a holding of the Supreme Court." *En Banc* Brief for Commonwealth at 4. The Commonwealth

being correct on this point, we limit our review to its first question.

▆▆▆ ¶ 10 Our scope and standard of review are well-settled.

> When the Commonwealth appeals from a suppression order, we ... consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Keller*, 823 A.2d 1004, 1008 (Pa.Super.2003) (quoting *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 880–81 (1998)). Here, no meaningful dispute of fact emerges, thus we consider only whether the trial court misconstrued or misapplied the law.

¶ 11 The exclusionary rule, which renders evidence seized in violation of constitutional protections inadmissible at trial, serves in Pennsylvania a purpose somewhat different from the purpose the rule serves under federal jurisprudence. The Pennsylvania Supreme Court recently has noted that

> [t]he Fourth Amendment's exclusionary rule has been construed by the United States Supreme Court as serving solely a deterrent purpose [to police misconduct], whereas the exclusionary rule under Article I, Section 8 [of the Pennsylvania Constitution] has been interpreted by this Court to serve the purposes of safeguarding privacy and ensuring that warrants are issued only upon probable cause.

*Commonwealth v. Zhahir*, 561 Pa. 545, 751 A.2d 1153, 1159 n. 5 (2000) (citations omit-

ted); *see Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). Of course, this undisputed proposition cannot blind us to the fact that knowledge of the likelihood of suppression of evidence improperly obtained under Article I, § 8 of the Pennsylvania Constitution will inevitably deter some police misconduct. *See Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251, 257 n. 3 (1993) ("Deterring police misconduct is not an end in itself. The ultimate distinction, then, between the federal and the Pennsylvania analysis is not that the federal courts seek only to deter police misconduct and the Pennsylvania courts seek to protect certain rights, but that the federal courts place less importance than do we on the right of privacy.").

▆▆▆ ¶ 12 That a secondary goal of deterrence lurks behind Pennsylvania's historically dogged protection of individual privacy rights under her constitution is evidenced by exceptions to the exclusionary rule like the independent source doctrine, which permits the introduction at trial of evidence seized during an illegal search if the prosecution can demonstrate that the allegedly tainted evidence ultimately would have been procured through means independent of the illegality. *See Mason*, 637 A.2d at 254. Thus, our Supreme Court has held that where there is probable cause independent of police misconduct that is sufficient in itself to support the issuance of a warrant, the police should not be placed in a worse situation than they would have been absent the error or violation under which the evidence was seized. *See Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115, 1119–20 (1993); *see also Commonwealth v. Rood*, 686 A.2d 442, 448 (Pa.Cmwlth.1996).

¶ 13 In *Brundidge*, our Supreme Court applied the independent source doctrine to sustain the seizure of evidence from a motel room. In that case, a motel housekeep-

er observed suspicious plastic baggies and other items in an apparently vacant motel room. *See* 620 A.2d at 1117. The motel manager informed an on-site undercover narcotics officer who conducted a warrantless search of the room and found 206 grams of cocaine in the pocket of a jacket that the prior occupants of the room had left behind. *See id.* The officer replaced the contraband in the jacket pocket and applied for a search warrant. *See id.* When the occupants returned to re-rent the room, the police executed the warrant, seized the drugs and other incriminating items, and arrested Brundidge. *See id.* Prior to trial, Brundidge filed a motion to suppress, which was denied. *See id.* On appeal of his consequent conviction, this Court reversed the trial court's order. *See id.* at 1118.

¶ 14 On the Commonwealth's appeal of that ruling, our Supreme Court agreed that the search was illegal, but reversed on the basis of the independent source doctrine. The Court relied on the two-prong test set forth by the United States Supreme Court governing the application of the independent source doctrine: "(1) whether the decision to seek a warrant was prompted by what was seen during the initial [warrantless] entry; and, (2) whether the magistrate was informed at all of the information" improperly obtained. *Id.* at 1119 (citing *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)). The Court also noted that, in *Murray,* the United States Supreme Court remanded *"to determine whether government experts would have sought the warrant if they had not earlier entered the site." Id.* (emphasis added). In *Brundidge,* the Court found that sufficient information and evidence existed, apart from the cocaine discovered in the jacket pocket, to support issuance of a search warrant for the room. *See id.* at 1119–20. The Court emphasized that the warrant application did not rely on the cocaine improperly discovered. Instead, it relied on the housekeeper's observations— which were corroborated by the officer's observations of baggies and other suspicious items in plain view—finding that they alone created probable cause for the search.

> *Because no evidence concerning the cocaine in the clothing was presented to the magistrate, the cocaine would have been discovered by a source independent of the initial illegality.*
>
> We hold, therefore, that both prongs of the test set forth in *Murray* have been met and the evidence in the present case is admissible under the "independent source" doctrine. To hold otherwise would be contrary to the purpose of the exclusionary rule, for it would put the police in a worse position than they would have occupied if no violation had occurred.

*Id.* at 1120 (emphasis added).

¶ 15 In *Mason,* decided by our Supreme Court ten months after *Brundidge,* the Court refined the independent source exception to the exclusionary rule. *See Mason,* 637 A.2d at 254. In that case, the Court considered whether the independent source doctrine supported the admissibility of contraband seized where police, waiting for a warrant to arrive and absent exigent circumstances, conducted a warrantless search of a private dwelling by breaking down the door with a battering ram. *See id.* at 255. The *Mason* Court cited *Brundidge* with approval, but questioned whether the independent source doctrine applied.

> It is axiomatic, of course, that once a judicially created rule is promulgated, the common law system requires that appellate courts consider this rule in its

various factual guises and expand or contract the rule as justice requires.

In the present case, there are significant factual differences from the *Brundidge* case. First, in the present case, the place of invasion is a dwelling place, whereas in *Brundidge* it was a motel room for which registration had expired; second the mode of entry in the present case was a battering ram, but in the *Brundidge* case, the trooper · simply walked through the open door; third, in the present case, there was no reasonable explanation for battering down the door before the warrant arrived, but in the *Brundidge* case, the trooper entered the motel room after checkout time at the invitation of the manager. These differences are significant ....

*Id.* (footnote omitted). Thus, in part because the particular violation—a warrantless entry of a dwelling by battering ram absent exigent circumstances—was an egregious constitutional affront, the Court found that the independent source doctrine did not make the otherwise excludible drugs admissible. *See id.* at 256–57.

¶ 16 Justice Cappy (now Chief Justice) affixed to *Mason* a prescient concurrence in which he suggested that

application of the "independent source doctrine" is proper only in the very limited circumstances where the "independent source" is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered.* In my view, the "independent source doctrine" can be safely applied under these limited circumstances because I do not believe that the police would risk an illegal entry based upon the remote possibility that a truly independent source will somehow materialize to remove the taint of their illegal entry.

*Id.* at 257–58 (Cappy, J., concurring) (emphasis in original). Several years later, the Supreme Court in *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226, 231 (1996), "adopt[ed] the limitation of the independent source doctrine which Mr. Justice Cappy proposed in *Mason* ...." In *Melendez,* the police entered and detained defendant and codefendant in an apartment while they awaited issuance of a warrant for which their colleague contemporaneously applied. *See* 676 A.2d at 227. The Court found that there was neither any source for the evidence seized as the result of a warrantless search and seizure of the person and premises of Patricia Melendez that was "truly independent" of "either the tainted evidence or the police who engaged in the misconduct," nor exigent circumstances sufficient to cure the misconduct. *See id.* at 231. The Court thus ruled that the evidence, including cocaine, weapons, and cash, required suppression.

¶ 17 In the case before us, the dispositive flaw in Trooper Bryan's affidavit in support of the first warrant application was technical in nature; Bryan failed to include in his warrant application an averment of his belief in the credibility of the paramedics who told him that Ruey appeared drunk. The Commonwealth conceded that this flaw invalidated the original warrant, acknowledging that "technical flaws" were fatal to the application prepared by Bryan. *En Banc* Brief for Commonwealth at 23; Order of Court, 11/29/00. When the District Attorney's office asked Trooper Allen to conduct a follow-up investigation, he prepared a new application and affidavit that contained no technical deficiencies and the magistrate issued a new search warrant for Ruey's medical records. The new application and affidavit made no reference to the tainted evidence secured under the aegis of the first, flawed war-

rant—*i.e.*, any reference to the actual BAC test result that had been seized under the first warrant or any other information gleaned from Ruey's medical file. Rather, it simply contained a new account of the evidence that originally led officers to suspect Ruey of DUI.

¶ 18 The suppression court, however, found controlling our Supreme Court's holding in *Melendez*. It concluded that "[a]lthough the actions of [Trooper Bryan] in the case *sub judice* are not as egregious as the acts of the officers in *Mason* and *Melendez* the result is the same, an illegal search." T.C.O., 11/14/01, at 5 (unnumbered). The court then continued:

> Applying the rule articulated in *Melendez* to the current facts therefore this Court must decide whether the second investigation by Trooper Allen constitutes an independent source for the acquisition of the medical records. In applying this rule it is clear that the actions of Trooper Allen in concurring [*sic*] with the original officer and essentially re-enacting his investigation is not an independent alternative source from which the evidence could have been obtained.

T.C.O., 11/14/01, at 5 (unnumbered) (citation omitted). The suppression court thus opined that "[t]he mere substitution of an officer for what is essentially a 'walk through' of the same investigation," T.C.O., 11/14/01, at 5 (unnumbered), could not be deemed "truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered." *Melendez*, 676 A.2d at 231 (original emphasis removed). We disagree.

¶ 19 There is no dispute that Trooper Allen's investigation followed in the footsteps of Trooper Bryan's investigation. The dispositive question under *Brundidge*, *Mason*, and *Melendez*, however, is whether and to what extent Trooper Allen, or the police at large, profited in their investigation from the initial violation, and whether the second warrant was secured by reference to the fruits of the officer's prior error—in sum, whether a warrant would have issued even absent the knowledge or evidence gleaned by that error. *Melendez* does not require construction of an impermeable barrier between police officers and their departments to preserve the applicability of the independent source doctrine, only between evidence secured due to official misconduct of whatever kind and the magistrate's chamber.

¶ 20 *Melendez* certainly circumscribed application of the independent source doctrine, and in doing so created some tension between its strict ruling and the more flexible ruling found in *Brundidge*. *See Melendez*, 676 A.2d at 231. It is incumbent on this Court, however, to reconcile these rulings, because nothing in *Melendez* suggests that the Supreme Court intended to overrule *Brundidge*. Indeed, the *Melendez* opinion never mentions *Brundidge*. Thus, we must analyze and decide this case in a fashion salutary to *Brundidge*, *Mason*, and *Melendez*, each of which is an important link in the chain of Pennsylvania's independent source doctrine, each of which remains 'good law.'

¶ 21 Our Supreme Court has provided a basis on which to do so in its clear reliance in *Melendez* on the "important difference" between those cases that involve "the invasion of a dwelling place" and those that do not. *See Melendez*, 676 A.2d at 231 ("[T]he facts in *Mason were importantly different* from the facts in previous independent source cases in that they involved the *invasion of a dwelling place*." (emphasis added)). Indeed, Justice Cappy, in connection with the passage of his concurrence in *Mason* that the Court elevated in

*Melendez,* suggested that police would not "risk an *illegal entry* based upon the remote possibility that a truly independent source will somehow materialize to remove the taint of their *illegal entry.*" *Mason,* 637 A.2d at 257–58 (Cappy, J., concurring) (emphasis added).

¶ 22 In the instant case, there has been neither an "invasion of a dwelling place" nor an "illegal entry" of any sort. Thus, even if *Melendez* applies, it does not preclude our ruling against suppression in the instant case. Moreover, the record suggests no illegal intrusion into Ruey's private medical records in reliance on the conjecture or assumption that a search warrant would issue at a later time. Rather, Officer Bryan clearly believed he was acting under the authority of a proper warrant, which he had in hand before seeking Ruey's medical records. Although it is beyond peradventure that Ruey had a legitimate interest in the privacy of his records, the conduct in question entailed no forcible entry, no violent intrusion into a private residence, nor any equivalent misconduct. In *Mason,* the Court distinguished an entry into a temporarily vacant motel room from that into a private residence, finding the former less offensive and disposing of the case partially on that basis. *See* 637 A.2d at 254–55. Here, the violation in question—a failure to include certain formal assertions regarding credibility on the warrant application—is even less substantial than the intrusion into the motel room relied upon in *Brundidge* and distinguished in *Mason.* The essence of this point was visited and reaffirmed in our Supreme Court's seminal *Edmunds* decision, where it noted that "nothing in the history of the Rules themselves, or related case law, mandate[s] that every violation of the Rules of Criminal Procedure—however technical—require[s] exclusion of evidence seized in the process. Rather, . . it is only where the violation implicates fundamental, constitutional concerns that exclusion may be appropriate." 586 A.2d at 903 n. 14 (internal quotation marks and citations omitted).

¶ 23 Moreover, this Court recently has recognized precisely this distinction. In *Commonwealth v. Smith,* 808 A.2d 215 (Pa.Super.2002), appellant, while driving under the influence of alcohol, crossed into the opposing lane of travel, struck an oncoming vehicle, and killed the other driver. *See id.* at 219. Appellant was transported to a hospital where a BAC test was administered for treatment purposes. *See id.* A State Trooper conducted an investigation which consisted entirely of interviewing appellant. *See id.* at 223 n. 5. Solely on the basis of that interview, a search warrant issued and appellant's BAC test results were seized. *See id.* The suppression court granted appellant's pre-trial motion to suppress because it found the search warrant invalid. *See id.* at 219. Subsequently, another detective conducted his own investigation. *See id.* at 220–21. The persons interviewed by that detective related that appellant had the odor of alcohol on and about her person and vehicle. *See id.* The detective applied for and received a new warrant and the BAC test results again were obtained. *See id.* at 221. The second investigator began his investigation by reviewing the first investigator's records, using those records much in the way Trooper Allen relied on Trooper Bryan's records in this case—as a guide to his own, independent investigation. Appellant sought suppression of the fruits of this second investigation. The suppression court concluded that the Commonwealth had obtained probable cause for the issuance of the second warrant through an independent source and thus denied suppression. *See id.*

¶ 24 On appeal of her judgment of sentence, appellant alleged that because the

subsequent detective relied, in part, on the initial State Trooper's report, the subsequent investigation was not "truly independent" under *Melendez* and that suppression therefore was compelled. *See id.* at 223. We disagreed. In finding the case "completely distinguishable" from *Melendez* and *Mason,* we noted that: "We do not have a situation where the police, in anticipation that a warrant will issue, violate a citizen's constitutional rights and then invoke the independent source doctrine." *Id.* Thus, even though the second investigator began by reviewing the first investigator's findings, *see id.* at 221, we nonetheless found the second investigation, in effect, to be "totally separate" from the first and therefore untainted by its illegality. *See id.* at 223. Here as well, the evidence obtained by the second investigator was not peculiarly available in virtue of the taint of the first investigation; rather, it was the product of precisely the sources any investigator would explore under the circumstances of the case. *Cf. Brundidge,* 620 A.2d at 1119 (identifying as germane to the determination whether to apply the independent source doctrine the inquiry "whether government experts would have sought the warrant if they had not earlier entered the site[?]"). That the evidence thus procured did not differ appreciably from that discovered during the first investigation does not materially alter our analysis.

¶ 25 Our sister Commonwealth Court has drawn a similar distinction, noting that the impetus behind limiting the scope of the independent source doctrine is, at least in part, to prevent the police from *benefiting* from unconstitutional conduct. *See Rood,* 686 A.2d at 448. In that case, the Commonwealth Court explained that

> [s]uppressing evidence which is supported by an independent source, or which would have inevitably been discovered, would effectively place the police

and prosecutors in a worse position when the particular evidence was, or would have inevitably been, lawfully obtained. In such situations, *there is no significant causal connection between the acquisition of the evidence and the unlawful police conduct,* and evidence so obtained is not considered to be tainted by, or to be the fruit of, an illegal search.

*Id.* (italics added; boldface in original); *see Brundidge,* 620 A.2d at 1119–20. Thus, the Commonwealth Court noted a contingent aspect to the relevant inquiry: *would* the evidence have been discovered *if not* for the misconduct? *See also Commonwealth v. Lehman,* 820 A.2d 766 (Pa.Super.), *allow. of appeal granted,* 575 Pa. 684, 834 A.2d 1141 (2003) (upholding the suppression court's denial of suppression because "[e]ven if the officer lacked the authority to awaken and detain the defendant, had he merely made observations and called the Pennsylvania State Police dispatcher, the Pennsylvania State Police Trooper *would have obtained the same evidence* " (internal quotation marks omitted; emphasis added)).

¶ 26 In view of this doctrinal history, we must endeavor to respect the competing interests reflected by our Supreme Court's pronouncements in *Mason, Brundidge,* and *Melendez.* First, we must recall the strong and oft-stated policy interest in ensuring that the police are not placed in a *less* advantageous position by the exclusionary rule than they would have been absent the misconduct that rule offsets in a given case. *See Brundidge,* 620 A.2d at 1119–20; *Rood,* 686 A.2d at 448. Were we to affirm the trial court's restrictive reading of *Melendez* in this case, the likelihood of a second, valid warrant issuing would have an inversely proportional relationship to the thoroughness of the first investigation. Thus, where, as in the case before

us, the first investigator effectively exhausted all avenues through which probable cause might be ascertained, subsequent investigators would effectively be barred from securing a warrant thereafter, no matter how immaterial the error committed during the first investigation. This state of affairs inevitably would lead to the police finding themselves in a position far worse than they would have been absent the investigator's error; moreover, it effectively would overrule the flexible approach we reaffirmed just last year in *Smith*. This interpretation of *Melendez* would subsume a rule of longer standing and clearer articulation, and fly in the face of probable cause caselaw in which Pennsylvania courts consistently have made commonsense determinations based on the totality of the circumstances. We will not read *Melendez* to subsume or overrule *sub silentio* a valid body of established law.

¶ 27 Fortunately, the circumstances of the cases under consideration provide a principled basis on which to harmonize the strong language of *Melendez* with the cautionary tone struck in cases like *Brundidge*. Historically, the type of violation committed by police has played a critical role in the evolution of the independent source doctrine. The Supreme Court in *Mason* and *Melendez* severely curtailed the doctrine's application where the underlying constitutional violation was egregious—*i.e.*, a warrantless, forcible entry into a dwelling in the absence of exigent circumstances. *Cf. Mason*, 637 A.2d at 257–58 (Cappy, J., concurring) (focusing on prevention of illegal entries by police). Just as clearly, however, the doctrine did not require suppression in *Brundidge* and *Smith*, where the violations in question were more benign. Here, the error was even more remote from the policy interests protected by the *Melendez* limitation. Trooper Allen conducted a second investigation in which he reviewed the circumstances of the accident and personally reinterviewed several witnesses. Trooper Allen, based on his own experience and judgment and the information provided him by individuals who were present at the accident scene, concluded that probable cause to suspect a DUI violation existed sufficient to merit preparation of a search warrant application.

¶ 28 Where the principal taint on the original investigation is a technical error in the drafting of an affidavit of probable cause, another officer must remain free to review and assess the facts independently and seek a new warrant, notwithstanding some connection to the original investigating officer. *See Smith*, 808 A.2d at 223 (upholding denial of suppression motion even where the second investigator relied on the first investigator's report and criminal complaint). We do not intend to diminish unduly the import of technical requirements in the securing of a valid warrant; indeed, we maintain that the first investigation itself was irreparably tainted by Trooper Bryan's omission.

¶ 29 This case, however, presents circumstances under which we can only conclude that the evidence in question would have come to light notwithstanding the taint on the initial investigation. Multiple witnesses indicated that Ruey appeared drunk. Moreover, officers at the scene discovered a number of empty and partially-empty bottles of alcoholic beverages in and around Ruey's vehicle. The responding paramedics also indicated that Ruey's conduct strongly suggested drunkenness. Trooper Allen's investigation was in no way tainted by the *fruits* of Trooper Bryan's prior investigation. *See Brundidge*, 620 A.2d at 1119 (citing *Murray*, 487 U.S. at 542, 108 S.Ct. 2529); *Lehman*, 820 A.2d at 771–72; *Smith*, 808 A.2d at 223; *Rood*, 686 A.2d at 448. No causal

nexus existed between the results of the first search and the successful application for the second warrant. *Cf. Rood,* 686 A.2d at 448. Cause to search Ruey's medical records therefore would have been found had Bryan's warrant application not been tainted by omission, which is sufficient to warrant application of the independent source doctrine. *See Lehman,* 820 A.2d at 771; *Rood,* 686 A.2d at 448.

¶ 30 Given the comprehensiveness of Bryan's initial investigation, Allen's investigation inevitably retraced ground covered by the first investigation, which culminated in a flawed search warrant application. *Cf. Smith,* 808 A.2d at 223. The independent source doctrine should ensure that law enforcement officers not find themselves in a worse situation than they would have been absent the violation. *See Brundidge,* 620 A.2d at 1119–20. It should not encourage officers to erect barriers to communication between and among themselves, nor should it create an incentive for first responders to perform less than comprehensive investigations in order to leave open alternative avenues for subsequent investigators to argue that they reached probable cause by an independent source, should a first warrant fail for reasons such as these. Thus, we find that neither *Mason* nor *Melendez* creates a *per se* rule requiring for probable cause that the original investigator be hermetically sealed off from his colleagues especially where, as here, the error tainting the first investigation had nothing to do with the knowing circumvention of constitutional requirements—*i.e.,* any substantial misconduct—and where, as here, none of the evidence secured improperly by the first investigation added anything of substance to the second investigation or the second warrant application.

¶ 31 Justice Cappy raised an important concern when he averred that " 'the independent source doctrine,' as an exception to the exclusionary rule, should not be allowed to swallow the rule itself." *See Mason,* 637 A.2d at 258 (Cappy, J., concurring). To affirm the suppression order in this case, however, would allow the exclusionary rule to swallow a time-honored exception, which we find to be an equally untenable outcome. *Cf. Melendez,* 676 A.2d at 233 (Castille, J., dissenting).

¶ 32 Thus we conclude that the second investigation, conducted by a different officer at a later time by reviewing sources that officer would be compelled by the least modicum of common sense to review even had no prior report or interviews been recorded, was sufficiently removed from the prior officer's omission to be considered "truly independent." Accordingly, we reverse the suppression order.

¶ 33 Order REVERSED. Case REMANDED for proceedings consistent with this Opinion.

¶ 34 President Judge DEL SOLE and Judges HUDOCK, TODD and KLEIN join this Majority Opinion.

¶ 35 Judge JOYCE joins the Dissenting Opinion by STEVENS, J. and files a separate Dissenting Opinion which is joined by Judges FORD ELLIOTT and MUSMANNO.

¶ 36 Judge STEVENS files a Dissenting Opinion which is joined by Judges FORD ELLIOTT, JOYCE and MUSMANNO.

DISSENTING OPINION BY JOYCE, J.:

¶ 1 I wholeheartedly join Judge Stevens' Dissenting Opinion. I write separately, however, to express additional reasons for my disagreement with the position espoused in the Majority's Opinion.

¶ 2 In the Majority's Opinion, my esteemed colleagues conclude that the strict limitations placed upon the applicability of the independent source doctrine in *Commonwealth v. Melendez*, 544 Pa. 323, 676 A.2d 226 (1996), do not apply in the instant case because the police only committed a "technical violation" (*i.e.* the failure to aver the credibility of a witness in a warrant application), not an "egregious constitutional affront" (*i.e.* an illegal home invasion). The Majority asserts that, in those instances where the police commit a technical or good faith violation, we need only consider whether the police actually *benefited* from the illegality and cite our Supreme Court's decisions in *Commonwealth v. Brundidge*, 533 Pa. 167, 620 A.2d 1115 (1993) and *Commonwealth v. Mason*, 535 Pa. 560, 637 A.2d 251 (1993) as support for this proposition. While I would concede that our Supreme Court's decision in *Brundidge* may support such an interpretation, I find that our Supreme Court's decision in *Melendez* evidences the Court's desire to place a greater restriction on the application of the independent source doctrine than it had advanced in *Brundidge*. In *Brundidge*, our Supreme Court discussed the applicability of the independent source exception in the context of a police officer's warrantless entry and search of a hotel room. Therein, a housekeeper entered a hotel room after checkout time in order to prepare the room for a subsequent guest. While inside the room, the housekeeper observed a diagram of the hotel's front desk and a number of one-inch square plastic baggies in plain view. When the housekeeper notified her manager of her observations, the manager escorted a police officer to the room and permitted the officer to conduct a search of the room and of the guest's personal effects. As a result of this search, the officer found a quantity of cocaine in a jacket which was covered in plastic and hung in the closet. The officer returned the cocaine to the pocket, departed from the room and submitted an affidavit for a warrant. In the affidavit, the officer listed the diagram of the front desk, the housekeeper's observation of plastic baggies containing "residue," the fact that baggies of that size were commonly utilized to package and sell drugs, and the fact that the police were investigating a prior robbery at the hotel as probable cause for the search warrant. A warrant was issued, and the police seized the baggies, the diagram and the quantity of cocaine located in the pocket of the defendant's jacket.

¶ 3 In determining whether the evidence seized during the search should be suppressed, the Court noted that a hotel guest has no expectation of privacy "in the room or in any item in plain view to anyone readying the room after checkout time for the next occupant." *Id.* at 173, 620 A.2d at 1118. Nonetheless, the Court also determined that "a hotel guest has a reasonable expectation of privacy to the contents of discrete and concealed personal effects in a motel room after checkout time." *Id.* at 174, 620 A.2d at 1118. In view of these privacy interests, the Supreme Court concluded that the "search of the jacket should have been accomplished pursuant to a judicial warrant issued upon probable cause." *Id.* at 174, 620 A.2d at 1119.

¶ 4 Since the officer did not possess a warrant when he initially searched the jacket, the Supreme Court considered whether the evidence would be admissible under the independent source doctrine. Our Supreme Court noted that the United States Supreme Court in *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) developed the independent source doctrine as a corollary to the federal exclusionary rule because

the interest of society in deterring unlawful police conduct and the public in-

terest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse* position, than they would have been in if no police error or misconduct had occurred. . . .

*Brundidge,* 533 Pa. at 175, 620 A.2d at 1119 (quotations and citations omitted) (emphasis in original). Adopting the rationale espoused in *Murray,* our Supreme Court employed a two-prong inquiry to determine whether evidence would be admissible under the doctrine, namely, "(1) whether the decision to seek a warrant was prompted by what was seen during the initial entry; and (2) whether the magistrate was informed at all of the information." *Brundidge, supra* at 176, 620 A.2d at 1119. In view of this standard, the Supreme Court determined that the quantity of cocaine found in the defendant's pocket would be admissible under the independent source exception because the officer did not mention the cocaine in his application for a warrant and because the magistrate issued the warrant without knowledge of the cocaine. The Supreme Court emphasized that "[t]o hold otherwise would be contrary to the exclusionary rule, for it would put the police in a worse position than they would have occupied if no violation had occurred." *Id.* at 176, 620 A.2d 1115. Justices Zappala and Cappy noted their dissent.

¶ 5 Ten months later, in *Commonwealth v. Mason, supra,* our Supreme Court revisited the applicability of the independent source exception in the context of the police's invasion of a home prior to the issuance of a warrant. In *Mason,* an undercover officer and a police informant approached a third man and asked him to purchase a quantity of cocaine for them from a residence. The man complied with their requests, and the police arrested the man within minutes after he departed from the home. The man informed police that he purchased the cocaine inside the residence, that he observed more cocaine in the residence, and that other individuals were making illegal transactions within the home. Based upon this evidence and the police's prior surveillance of the residence, one officer left the scene to secure a warrant. Before the officer could return with the warrant, another officer entered the apartment by force in an effort "to secure the occupants and any evidence which might be present." *Id.* at 563, 637 A.2d at 252. Upon entry, the officers secured the occupants and found a rock of cocaine and drug paraphernalia in plain view. Following the arrival of the warrant, the officers discovered marijuana, additional drug paraphernalia, drug records and drug packaging materials.

¶ 6 In determining whether the trial court properly denied Appellant's motion to suppress the evidence obtained from the search, the Supreme Court questioned whether it should apply the independent source exception, as enunciated in *Murray* and *Brundidge,* or whether it should constrict the applicability of the rule in the interests of justice. Foremost, our Supreme Court considered that significant factual differences existed between the instant case and the *Brundidge* case. While the *Brundidge* case involved an officer's entry into an unregistered hotel room at the invitation of a manager, the facts in *Mason* involved a forceful and unreasonable invasion of a home. Additionally, the Supreme Court considered that Pennsylvania's exclusionary rule has a different focus than the exclusionary rule under the Fourth Amendment. While the federal exclusionary rule exclusively seeks to deter police misconduct, the exclusionary rule under Article I, Section 8 of the Pennsylvania Constitution serves to bolster the

twin aims of safeguarding privacy and ensuring that warrants only issue upon probable cause. In its effort to uphold these twin aims, the Supreme Court refused to apply the independent source exception and determined that any items seized pursuant to the police's illegal entry may not be introduced into evidence.

¶ 7 In a concurring opinion, Justice Cappy agreed with the Majority's disposition but wrote separately to express his continuing disagreement with the *Brundidge* decision and to praise the Majority for the "reining in of what might have otherwise become an unfettered stampede to apply the independent source doctrine in contravention of the clear purposes of Article I, Section 8 of the Pennsylvania Constitution and exclusionary rule." *Id.* at 572, 637 A.2d at 257. Justice Cappy explained that he dissented in *Brundidge* due to his concerns that the evidence obtained during the search of the hotel room was not "truly independent" of the illegality. *Id.* at 572 n. 1, 637 A.2d at 257 n. 1.

¶ 8 Despite his praise for the decision in *Mason,* Justice Cappy suggested that the Majority should have placed an even greater limitation on the application of the doctrine. Specifically, he stated:

I believe application of the "independent source doctrine" is proper only in the very limited circumstances where the "independent source" is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered....* Thus, in the case *sub judice,* I would go further than the majority and hold that except under extraordinarily specific circumstances which are not present here, i.e., a *truly independent source,* this Court should never tolerate the entry or search of *any* constitutionally protected private place, absent exigent circumstances, without the proper *and prior* issuance of a valid search warrant. Such an illegal entry or search should always result in the application of the exclusionary rule, and the consequent suppression of any evidence discovered as a result of police misconduct, whether intentional or inadvertent. I am compelled to conclude that the application of the "independent source doctrine" in a situation where the "independent source" is not truly independent of both the tainted evidence itself and the officers involved in the initial illegal search will completely eviscerate the exclusionary rule, failing to either deter police misconduct or to protect individual privacy rights as required by Article I, Section 8 of the Pennsylvania Constitution.

*Id.* at 573–4, 637 A.2d at 257–8 (emphasis in original).

¶ 9 Three years later, our Supreme Court adopted the express limitation on the applicability of the independent source doctrine proposed by Justice Cappy in *Mason.* In *Commonwealth v. Melendez,* 544 Pa. 323, 676 A.2d 226 (1996), police were conducting surveillance of a residence to investigate suspected drug activity. While waiting for another officer to secure a warrant, the police observed the defendant exit the home and drive away from the scene. The police stopped the defendant, searched her belongings and found a gun, cash and a drug tally sheet. The police then returned to the residence and utilized the defendant's keys to gain entry. Upon entry, the police observed another individual holding a bag of cocaine. Once the warrant arrived, the police conducted a search of the home and discovered additional contraband.

¶ 10 On appeal, the defendant maintained that the vehicle stop and the subsequent search of the home, without a

warrant, required the suppression of the evidence. In considering this claim, the Supreme Court concluded that the independent source exception to the exclusionary rule remains valid in this Commonwealth but recognized that the Supreme Court's efforts to narrow the applicability of the doctrine in *Mason* had not adequately protected privacy interests or deterred police misconduct. Thus, the Court concluded that the independent source exception may only be invoked in the limited situation where the "independent source is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered." *Id.* at 334, 676 A.2d at 231. Since the Commonwealth could not demonstrate that the evidence seized was "truly independent," the Supreme Court suppressed the evidence obtained during the illegal search.

¶ 11 Viewing these cases in their historical context, I find that the Supreme Court has effectively expressed its intention to depart from the *Brundidge* Court's broad characterization of the independent source exception in recognition of the privacy interests afforded our citizens under Article I, Section 8 of the Pennsylvania Constitution. In *Brundidge,* our Supreme Court adopted the definition of the independent source doctrine contained in the United States Supreme Court's decision in *Murray,* and, like the *Murray* Court, focused exclusively upon a desire to deter unlawful police misconduct and to prevent the police from *benefiting* from their misconduct.

¶ 12 In *Mason,* however, our Supreme Court began to recognize the limitations of the approach espoused in *Murray* and *Brundidge* when it confronted a forcible home invasion. The *Mason* Court recognized that a strict application of the doctrine would have required the Court to

admit the evidence; the police had applied for a warrant prior to the illegal entry and the magistrate issued the warrant based on legally discovered evidence. Nevertheless, the Court refused to apply the doctrine due to the officer's misconduct and in recognition that the "exclusionary rule in Pennsylvania has consistently served to bolster the twin aims of Article I, Section 8; to-wit, the safeguarding of privacy and the fundamental requirement that warrants shall only be issued upon probable cause." *Mason,* 535 Pa. at 570, 637 A.2d at 256 (quotation omitted).

¶ 13 In its most recent discussion of the applicability of the independent source doctrine, our Supreme Court in *Melendez* effectively distanced itself from the approach advanced in *Brundidge.* In *Melendez,* the Court did not consider that the police applied for a warrant prior to their illegal entry into the home and that the magistrate approved the warrant based on legally obtained evidence. Additionally, the Court did not contemplate whether its decision would place the police in a worse position than if they had not engaged in the misconduct. Rather, the Court focused on its desire to protect a citizen's privacy interests in his/her home and to deter police from engaging in conduct that subjects citizens to unreasonable searches and seizures. The Supreme Court concluded that the only effective way to advance these goals was to restrict the application of the independent source doctrine to those instances where the "independent source is truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered." *Melendez,* 544 Pa. at 334, 676 A.2d at 231.

¶ 14 Although my colleagues in the Majority assert that we may only apply the *Melendez* rule in those instances where the

police acted in bad faith or committed an "egregious constitutional affront", I find no support for this position in the language of *Melendez.* The *Melendez* Court did not limit the application of its formulation of the independent source doctrine to home invasion cases. Additionally, I note that Justice Cappy did not intend for his proposed rule to have such limited application. In his concurring opinion, Justice Cappy stated that

> except under extraordinarily specific circumstances..., i.e., a *truly independent source,* [the courts] should never tolerate the entry or search of *any* constitutionally protected private place, absent exigent circumstances, without the proper *and prior* issuance of a valid search warrant. Such an illegal entry or search should always result in the application of the exclusionary rule, and the consequent suppression of any evidence discovered as a result of police misconduct, whether intentional or inadvertent.

*Mason,* 535 Pa. at 574, 637 A.2d at 258 (emphasis in original).

¶ 15 Further, I cannot accept my colleagues' assertion that *Mason* and *Melendez* stand for the proposition that we need only consider "whether and to what extent the ... police ... profited in their investigation from the initial privacy violation, and ... whether the warrant would have issued even absent the knowledge or evidence gleaned [from police] error." *See* Majority's Opinion, at 567. Nor can I accept that *Melendez* only mandates an "impermeable barrier" between "evidence secured due to official misconduct of whatever kind and the magistrate's chamber." *See* Majority's Opinion, at 567. As I stated *supra,* the officers in *Melendez* and *Mason* applied for and received warrants based upon legally obtained evidence. Nevertheless, in both cases, the Supreme Court refused to apply the approach ad-

vanced in *Brundidge* and *Murray* and *placed the police in a worse position* in order to safeguard the privacy interests afforded the citizens of this Commonwealth.

¶ 16 Additionally, as the author of our Court's decision in *Commonwealth v. Smith,* 808 A.2d 215 (Pa.Super.2002), I cannot agree with the Majority's assertion that the *Smith* panel refused to strictly apply the independent source doctrine as enumerated in *Melendez.* As the Majority aptly notes, the *Smith* panel recognized the strict limitations placed upon the applicability of the independent source exception in *Melendez* but determined that the Commonwealth demonstrated the truly independent nature of the evidence. Nor can I agree with the Dissent's suggestion that the "second investigation" conducted in *Smith* was not truly independent of the first because Detective Lindsay "skimmed" the report of the previous officer. Although Detective Lindsay indicated that he "skimmed" the report to obtain necessary background information, namely, the date and location of the accident, the names of the individuals involved, and other general information, Detective Lindsay testified that he could have obtained the same information from newspaper accounts of the accident. Most critically, after obtaining this basic information, Detective Lindsay conducted his own investigation and uncovered new witnesses who provided new evidence which was used to obtain the search warrant. Detective Lindsay did not simply conduct a "walk through" of the first investigation.

¶ 17 Upon my review of the Supreme Court's decisional precedent, I cannot agree that the independent source exception articulated in *Brundidge* has any remaining application in this Commonwealth because it contravenes the purposes of Ar-

ticle 1, Section 8 of the Pennsylvania Constitution. Thus, I dissent.

¶ 18 Judges FORD ELLIOTT and MUSMANNO join this Dissenting Opinion.

### DISSENTING OPINION BY STEVENS, J.:

¶ 1 I conclude that the trial court properly suppressed the evidence in this case because the Commonwealth did not meet the requirements of the "independent source doctrine," and therefore, I respectfully dissent.

¶ 2 Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect citizens against unreasonable searches and seizures. U.S. Const. amend. IV; Pa. Const. Art. I, § 8. "This right does not depend on a property right in the place of the search but it does depend on whether the person has a legitimate expectation of privacy in the invaded place." *Commonwealth v. Mason,* 535 Pa. 560, 567, 637 A.2d 251, 254 (1993). The right to privacy extends to medical records. *Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295 (2001) (holding that BAC test results must be suppressed where the blood was drawn for independent medical reasons and the results were released to the police without a warrant or an exception to the warrant requirement).

¶ 3 Here, the Commonwealth asserts that Appellee Speer Ruey's medical records, including his BAC test results, should be admissible under the "independent source" doctrine, also known as the inevitable discovery doctrine.[1] In *Melendez,* the Supreme Court discussed the independent source doctrine at length. In that case, police were conducting an undercover surveillance of a house.

An application for a search warrant was being drafted when the police observed the defendant leave the house, get into an automobile, and drive away. Police stopped the defendant, removed her from the vehicle, searched her purse, and discovered a gun, cash, and a drug tally sales sheet. After transporting the defendant to her home, police used her keys to gain access to the premises. Upon entering, police observed the defendant's co-defendant holding a bag of cocaine. The police secured the scene and waited an hour for the arrival of a search warrant. Upon executing the search warrant, police discovered drugs, cash, and other evidence of narcotic trafficking.

*Commonwealth v. Smith,* 808 A.2d 215, 221 (Pa.Super.2002) (summarizing the facts of *Melendez* ).

¶ 4 In discussing the independent source doctrine, the Supreme Court indicated that the doctrine provides that "if the prosecution can demonstrate that the evidence in question was procured from an independent origin, such evidence is admissible." *Melendez,* 544 Pa. at 332, 676 A.2d at 230. The Supreme Court limited the application of the independent source doctrine and specifically stated that "[a]pplication of the 'independent source doctrine' is proper only in the very limited circumstances where the 'independent source' is *truly independent from both the tainted evidence and the police or investigative team which engaged in the misconduct by which the tainted evidence was discovered."* *Melendez,* 544 Pa. at 333, 676 A.2d at 231 (quotation omitted) (emphasis in original).

¶ 5 Applying the aforementioned standard in *Melendez,* the Supreme Court held that the conduct of the police in conducting

---

**1.** I note that the burden of proving that the independent source doctrine applies rests

with the Commonwealth. *See Commonwealth v. Ingram,* 814 A.2d 264 (Pa.Super.2002).

an illegal search and seizure and then detaining the defendant and the co-defendant in the secured premises, all the while waiting to see if their application for a warrant was even approved, did not qualify under the independent source doctrine.

¶ 6 Recently, in *Commonwealth v. Smith*, 808 A.2d 215 (Pa.Super.2002), a three-judge panel of this Court examined *Melendez* and applied it to a situation where the appellant was operating her vehicle when she collided with another vehicle, thereby killing the other driver. The appellant was taken to the hospital where her blood was drawn for treatment purposes. Trooper Allen received a copy of the appellant's BAC and the appellant was charged with various offenses. The appellant sought suppression of the BAC, and the motion was granted on the basis Trooper Allen had obtained an invalid search warrant for the appellant's medical records. Subsequently, Detective Lindsay of the District Attorney's Office conducted his own investigation, and he called the 911 center, from which he learned the identity of a witness. Based on various statements made by the witness, Detective Lindsay contacted the Bradford City Fire and Ambulance Association and spoke to an ambulance crew member who had responded to the scene. The crew member indicated that he had not spoken to any law enforcement official about the case. Based on statements made to him, Detective Lindsay applied for a search warrant for the appellant's medical records, which was granted. The appellant once again moved for suppression of the records, and the trial court concluded that the records were obtained from information for the warrant through independent sources apart from the original taint. The appellant was subsequently convicted and filed an appeal to this Court.

¶ 7 On appeal, this Court affirmed the denial of the appellant's motion to suppress, indicating that, although *Melendez* applied, the circumstances in *Smith* were distinguishable from those presented in *Melendez*. Specifically, this Court concluded that the evidence was admissible under the independent source doctrine. In so concluding, we noted that a completely different investigator engaged in a totally separate investigation. The detective's information came primarily from two witnesses who were not mentioned in Trooper Allen's reports or relied upon by Trooper Allen.

¶ 8 Applying *Melendez* and *Smith* to the case *sub judice*, I conclude that Trooper Allen, who conducted the second investigation and applied for the second search warrant, was not truly independent from the original investigative team, as Detective Lindsay was in *Smith*. At the suppression hearing, as indicated *supra*, Trooper Allen testified that he went to the accident scene to deliver required supplies. He was present at the accident scene at the same time as Trooper Bryan and his primary purpose for being at the accident scene was to "bounce ideas off of each other." N.T. 9/24/01 at 23. He testified that "[o]nce I got there, I spoke with Corporal Faust, pretty much trying to figure out what happened, the nature of the accident." N.T. 9/24/01 at 22. Trooper Allen further indicated that he assisted in the accident reconstruction by helping to make the accident diagram. N.T. 9/24/01 at 23. Moreover, Trooper Bryan confirmed that Trooper Allen was present at the accident scene and that "[p]rimarily, he assisted at the scene, and eventually he helped with the reconstruction to take measurements." N.T. 9/24/01 at 19. Trooper Bryan testified that Trooper Allen conferred with him while the case was pending, before Trooper Allen was asked by the Commonwealth to conduct his own "independent" investigation. Based on the aforementioned, I conclude that Trooper

Allen was more than merely present at the accident scene during Trooper Bryan's investigation, and, therefore, he was not independent of the original investigative team.

¶ 9 Trooper Allen admitted that he used Trooper Bryan's file, contacted the exact same witnesses, learned of no new evidence or statements, and copied directly from Trooper Bryan's report when he applied for the second search warrant. He even specifically admitted that "I didn't do an investigation in addition to [Trooper Bryan's]," he "looked at what [Trooper Bryan] did and looked to make sure it was correct," and he conversed extensively with Trooper Bryan while preparing the second warrant. N.T. 9/24/01 at 33, 34. As such, I agree with the suppression court's conclusion that "[t]he mere substitution of an officer for what is essentially a 'walk through' of the same investigation is merely an attempt to cure the illegality of the original investigation. The independent source doctrine was not established to provide for multiple attempts at the same investigation...." Suppression Court Order filed 11/14/01 at 5.[2]

¶ 10 For all of the reasons enunciated *supra*, I conclude the trial court properly suppressed the evidence in this case, and therefore, I respectfully dissent.

¶ 11 Judges FORD ELLIOTT, JOYCE and MUSMANNO join this Dissenting Opinion. Judge JOYCE also files a separate Dissenting Opinion which is joined by Judges FORD ELLIOTT and MUSMANNO.

---

2. As noted by the Majority, in its final claim, the Commonwealth requests this Court to overrule the Supreme Court's decision in *Melendez*. However, the Commonwealth acknowledges that this Court cannot overrule a Supreme Court majority decision and indicates that the claim is included in its brief for preservation purposes only. As such, I agree with the Majority that this issue should not be examined further.